SMITH vs. SHERRY.

*December 15, 1881 — January 10, 1882.*

RES ADJUDICATA. *(1) What questions previously adjudged herein.*
TOWNS: BOUNDARIES. *(2) Statute as to change of boundaries: in what respects mandatory.*
TAX DEEDS: LIMITATION OF ACTIONS. *(3) Tax deeds, when mere nullities. (3–5) Limitation of actions on tax deeds.*

1. By the decision in a former appeal herein (50 Wis., 210), it was determined that ch. 92 of 1872, annexing certain townships to the village of Shawano, was unconstitutional, and that the lands here in question were not taxable by the authorities of said village. But the question arising on this appeal, whether said lands were taxable by the authorities of the town of Seneca, is not *res adjudicata* by that decision, the parties having omitted, upon the former trial, at the request of the court below, to litigate that question.

2. The statutes (secs. 670, 671, R. S.) prescribing the form in which orders and determinations of a county board for changing the boundaries of towns shall be made, and requiring their publication, are *mandatory*, and must be substantially complied with, to effect such a change.

3. A tax deed, after the expiration of the statutory period of limitation, is conclusive of the regularity of the proceedings upon which it is based, *only in cases where the lands were taxable* by the town or other taxing district whose authorities assumed to levy the tax. In other cases, as where the lands were outside of the jurisdiction of such town or other taxing district, the sale and deed are mere nullities, and do not set the statutes to running.

4. Section 1210e, R. S., was designed merely to limit the time for bringing the equitable action therein mentioned, by the original land-owner, and does not prevent the running in his favor (when he is in possession of the land) of the limitation prescribed by sec. 1210d.

5. To stop the running of the statute of limitations on tax deeds, against the former owner, it is sufficient that he be in actual and open possession for any considerable portion of the statutory period; and upon the facts found in this case (recited below), defendant's possession is held to have been sufficient for that purpose.

[6. It is an open question in this court, whether a tax-title claimant who has never acquired the actual possession of the land, can recover against the former owner, as damages (under sec. 4269, R. S.), for timber removed by such former owner while the land was in his possession, its highest market value between such removal and the trial.]

APPEAL from the Circuit Court for *Shawano* County.

Action for a trespass to land, and the removal therefrom of pine timber. Plaintiff claimed title to the land under a tax deed from the county of Shawano, based upon a sale for non-payment of taxes assessed upon the land in 1872, by the town of Seneca in said county. The case is further stated in the report of the decision of a former appeal herein, found in 50 Wis., pp. 210–218.

The facts found by the court on the second trial, bearing upon the question of defendant's actual possession of the premises in dispute at any time between the recording of plaintiff's tax deed (April 12, 1877), and the expiration of the statutory period of limitation, were substantially as follows: The lands described in the tax deed, and here in dispute, were the whole of a certain sec. 3, except the east half of the north-west quarter thereof. On the 2d of January, 1877, plaintiff and defendant entered into a contract in writing, by which defendant was to cut and remove, during that year, the pine timber on said excepted half-quarter section, which then was and has ever since been the property of the plaintiff. Soon after the execution of this contract, one Martin, employed by defendant to remove said timber, built shanties on the *south half of the southeast quarter* of said section, and occupied

them with a crew of men until the spring of 1877, as defendant's agent, and made a road from the east half of the northwest quarter of the section, to a point on the river near said shanties, for the purpose of moving the timber from said east half-quarter section, pursuant to the contract just described. Said "Martin road" passed over the south half and northwest quarter of the southeast quarter, and also over the northeast quarter of the southwest quarter of said section 3; and it was convenient to occupy and use said road and also said shanties on the land in dispute, in order to cut and remove the timber from the east half of the northwest quarter. Before Martin vacated said shanties in the spring, he had cut and removed from the east half-quarter just mentioned, a portion of the timber, leaving several hundred thousand feet still thereon; but he did not at that time cut or remove any timber from the land in dispute. After Martin vacated said shanties in the spring of 1877, they remained unoccupied until November 12, 1877. On the 2d of October, 1877, one Davis, the former owner of the land embraced in the tax deed, executed and delivered to defendant a contract of sale of all the pine timber on said land, together with all the timber on forty other forty-acre tracts, by which contract defendant had ten years in which to remove the timber from all of said tracts. Said contract of sale was never recorded; but plaintiff knew of defendant's entry into possession soon after the contract was made, though he did not know of any acts of possession by defendant between March 25 and December 25, 1878. Before March 25, 1878, both defendant and Davis had actual notice of the tax deed to plaintiff and his claim to own the land under it, but they both supposed the deed to be illegal because of a resolution of the county board purporting to cancel it; and no action was commenced by either Davis or the defendant to recover possession of the land or to set aside the tax deed. Prior to the logging season of 1877–8, the defendant and Martin made an arrangement by which defendant

was to remove the timber still remaining on the east half of the northwest quarter of said section [pursuant to Martin's contract with the plaintiff]. Between the 12th and 15th of November, 1877, the defendant, by his agents and servants, went into the shanties above mentioned, for the purpose of cutting and removing said remaining timber of said east half-quarter section, and also the timber embraced in the contract between Davis and the defendant, claiming the right to so enter under his contract with Davis, and not under the plaintiff; and he occupied said shanties for the purpose just mentioned in the winter season, and for agricultural purposes in the spring and summer, until the trial of this action; "but during the season of 1877 and 1878 he cut no timber and made no roads after the 18th of March, 1878, until November, 1878, when he again cut roads, and repaired other roads on the land." During said season of 1877–78, defendant did not cut the remaining timber of plaintiff's east half-quarter section above described. Up to November 12, 1877, no timber was cut on the lands embraced in the tax deed, and they, and the whole township in which they lie, were wholly wild and uncultivated. From about November 12 to December 25, 1877, defendant's agents and servants were engaged in making and repairing logging roads on the land embraced in defendant's contract with Davis, and they made new or repaired old roads (including the "Martin road") on every forty-acre tract in the section. Between November 12, 1877, and March 18, 1878, defendant cut timber (in amounts varying from 5,000 to 300,000 feet) on each, except five, of the fourteen forties included in the tax deed. In the spring of 1878 he also cleared for agricultural purposes about two and a-half acres in the south half of the southeast quarter of the section, in the neighborhood of the shanties above mentioned, and, by his servants, occupied said shanties and clearing during the spring, summer and fall of that year; and from that time until the trial cultivated the cleared land in the summer season, and in

the winter season occupied the shanties for the purpose of lumbering upon the lands in dispute and other lands claimed by him. About November 1, 1878, he went into said shanties, by his servants, for the purpose of cutting the timber on the land described in his contract with Davis, and also the timber on plaintiff's east half-quarter section above described; and he occupied said shanties until the spring of 1879. Between November 1 and December 25, 1878, his servants and agents worked in repairing the "Martin road" and other roads made .in 1877, over the lands included in the Davis contract, and also in making new roads through various parts of the section. Between March 25 and December 25, 1878, no timber was cut or removed from any of the lands in dispute, nor any.roads worked thereon. During all the times above mentioned, "it was the custom of lumbermen and parties putting in timber to make logging roads and shanties upon wild lands wherever they were wanted for that purpose, without regard to the ownership of the land, and such practice was always acquiesced in without objection by the owners of such lands, and was known to the parties to this action."

Both parties took various exceptions to these findings; but no useful end will be served, apparently, by specifying the exceptions.

Upon the facts found, the court held that before the statute of limitations had run upon the tax deed, in plaintiff's favor, the defendant and those under whom he claims had entered into such possession and occupancy of each forty-acre tract of the premises in dispute, as disengaged the bar of the statute and relieved the defendant from the conclusive effect of the tax deed; and that defendant was entitled to a judgment dismissing the complaint. From the judgment accordingly entered in defendant's favor, the plaintiff appealed.

For the appellant there was a brief by *Hastings & Greene*, and oral argument by *Mr. Greene*.

For the respondent there were separate briefs by *Moses*

*Hooper* and *Finch & Barber*, and oral argument by *Mr. Hooper* and *Mr. Barber*.

CASSODAY, J. This case was here upon a former appeal. 50 Wis., 210. It is now urged that it was found on the first trial, and that consequently this court then held, that the lands in question were in the town of Seneca, and hence that such decision is *res adjudicata*. It is true, the court found, on the first trial, that the lands in question were a part of the territory specified in chapter 92, P. & L. Laws of 1872, and that before the passage of that chapter they were a part of the territory of the town of Seneca, and that they were taxed both in Seneca and the village of Shawano, and hence that the deed taken thereon was void by reason of the payment of the taxes levied by the village, and because the lands were not in the village, nor taxable in Seneca. But it appears from a stipulation in the record, signed by the attorneys for the respective parties, and sanctioned by the trial judge, June 29, 1880, reciting the rulings of the court, that the defendant refrained from going into his whole defense at the request of the trial judge, and that if the judgment should be reversed the cause was to be remanded for a new trial, and judgment not to be directed by the court on that appeal. The cause was reversed, and remanded for a new trial, in accordance with the stipulation, and for the reasons therein expressed. 50 Wis., 218. Under these circumstances we must hold that the former decision of this court only went to the extent of holding the act of 1872 unconstitutional, and that under it the village of Shawano had no jurisdiction to levy a tax upon, nor collect a tax from, the lands in question, and hence all other questions were left open for litigation on the second trial. Thus the question litigated upon the first trial was not whether the town of Seneca had jurisdiction to levy and collect the tax from the lands, but whether the village of Shawano had such jurisdiction. The question litigated upon the second trial was not

whether the village of Shawano had jurisdiction to levy and collect the tax from the lands, but whether the town of Seneca had such jurisdiction.

Confessedly the lands, at the time the taxes in question were levied and assessed, were not in the town of Seneca, unless they were attached by an unpublished order of the county board, passed March 29, 1872, and entered in the minutes. Undoubtedly the county board had the power to change the boundaries of towns therein, in case proceedings were had in the manner prescribed in sections 28, 33, ch. 13, R. S. 1858; sections 670, 671, R. S. The statute also prescribed the form in which all such orders and determinations should be carried into effect. Section 29, ch. 13, R. S. 1858, now subd. 11, sec. 670, R. S. The order passed was not in the form prescribed, but substantially different, and attempted to attach one piece of territory to one town and another to another town, on mere motion. The record is this: "On motion of Carl Schmitz, the board of supervisors do order and determine that town 28, range 14, be attached to the town of Herman for town purposes, and that town 28, range 13, be attached to the town of Seneca for town purposes."

The statute also provided that whenever such order or determination was made, the same should be published in some newspaper, and a copy of such publication furnished to each of the town clerks of the county, to be kept by them on file in their respective offices. Sections 30, 31, ch. 13, R. S. 1858; section 674, R. S. It also required that whenever the board organized a new town or altered the boundaries of any town in their county, they should cause a plat and record to be made thereof, by their clerk, specifying the name and boundaries of such town, which plat and record should be kept in the office of such clerk. Section 39, ch. 13, R. S. 1858; section 673, R. S. By a compliance with these several statutory requirements, the respective town officers, and the county officers, as well as the public, would be fully advised of the precise boundaries of every

town, and all confusion, like that in the present case, would be obviated. Such boundaries are essential to the existence of a town. *C. & N. W. Railway Co. v. Town of Oconto,* 50 Wis., 193, 194. The legislative intent was thereby clearly indicated, and the importance of a compliance with these statutory requirements cannot be overestimated. Every citizen is directly interested in knowing the town he lives in. It is liable to enter into the description of every piece of real estate conveyed. Every voter decides for himself, and at his peril, as to the boundary lines of his town. Can it be claimed that the statute as to the form and publication of the order and determination in question are merely directory, thus opening the door for interminable mistakes upon the part not only of citizens, but of town officers? If the attempt to detach territory from one town and add it to another, or to attach more territory to an organized town, is so defective as not to protect the voter or the tax-payer, can it be held that it is nevertheless sufficient to protect and vest title in the tax-title claimant?

It seems to us that the statutes relating to the form and publication of the order and determination are mandatory, and must be substantially complied with in order to effect a change of boundary. It was in effect so held in *State v. Pierce,* 35 Wis., 93. In *Clark v. Janesville* it was held by this court that the charter of the city did not go into effect until published, notwithstanding a question under the charter within its terms was, prior to such publication, submitted to the voters and voted upon. 13 Wis., 414; 10 Wis., 135. In *Pettit v. May,* 34 Wis., 674, it was held, in effect, that where a charter requires an ordinance to be published, it is of no effect until publication, and that the defect is not waived by failure to specifically object. See also *Nevada v. Rogers,* 10 Nev., 250; *Antonia v. Gould,* 34 Texas, 49. In view of these adjudications, as well as upon principle, we are clearly of the opinion that the attempt to attach the township in question to the town of Seneca by the unpublished order and determination referred to, was ineffectual to accomplish the purpose.

It is claimed, however, that, conceding this to be true, yet there was not such want of jurisdiction in the tax proceedings prior to the tax deed as to prevent the statute of limitation running in favor of the plaintiff; and a very ingenious and forcible argument is made in support of such claim. The gist of the contention is, that the order of the board gave color of authority to the town of Seneca to assess and levy the tax in question, and that when the deed was issued it became *prima facie* evidence of the regularity of all proceedings, from the valuation by the assessors, inclusive, up to the execution of the deed, and hence the deed was sufficient to set the statute of limitation running. In support of the proposition, counsel rely principally upon *Knox v. Cleveland*, 13 Wis., 245; and *Oconto Co. v. Jerrard*, 46 Wis., 317.

In *Knox v. Cleveland* the attempt was made to show that part of the taxable lands in the district had been "deliberately and intentionally omitted;" but the time prescribed by the statute had already run. In giving the opinion of the court, Dixon, C. J., said: "We are of opinion that the statute put these matters at rest, and that the appellant cannot go into them. It made the deed, in the first instance, *prima facie* evidence of the regularity of all proceedings from the valuation by the assessor, inclusive, up to the execution of the deed. The levy of taxes followed the valuation. The deed was therefore presumptive evidence that the taxes were properly levied. It was like evidence that all taxable property within the district was duly assessed. . . . The statute has closed the door to their investigation." This view is reiterated and pressed with great force, by the late chief justice, in *Oconto Co. v. Jerrard*. But there is an important qualification mentioned in each of those cases, which seems to be peculiarly applicable here. Judge Dixon, in *Knox v. Cleveland*, said: "The general authority of the taxing officers, and the liability of the land to taxation, being conceded, all other questions are at an end. If *either* of them were wanting, another question would be presented. It might then be urged that there was a defect of jurisdiction; that the sale

was altogether unauthorized and void, and passed no title *or color of title*, and furnished nothing upon which the statutory bar could operate." Page 285. This language is quoted with approval by the late chief justice, and he adds that it "suggests the only condition of things to which the statute will not apply — want of authority *ab initio* of the taxing officers to put the taxing power in motion. . . . Property exempt from taxation by law is excepted from all authority to levy taxes, and is as much without the jurisdiction of taxing officers as if it were *without their taxing district* or without the state. A tax cannot attach to it, because it is *not a subject* of taxation. The power of taxation is an attribute of sovereignty, and can be exercised *only* under express authority of the sovereign. Every tax in this state must be expressly authorized by statute. The state acts through its municipalities, and the municipalities act through their officers; . . . and when municipalities or their taxing officers assume to levy a tax or to institute a tax proceeding not authorized by statute, they are outside their functions, and are not acting *virtute officii*. They are not in the exercise of the sovereign power of taxation, and are as powerless to tax as private persons. Their whole proceeding is a mere usurpation, and absolutely void throughout for all purposes. In such a case there is nothing for the statute of limitations to act upon." Pages 327, 328.

Are these expressions applicable to the case before us? As already observed, the court found that March 29, 1872, none of the lands in question were in the town of Seneca. On that day the county board attempted to attach the township within which the lands were situated, to the town of Seneca, for town purposes, by simply adopting a motion to that effect, and entering the same upon their records, but which was never published. Of course, the board were bound to know the law, and that without publication the order was nugatory. This case must therefore be determined the same as it would have been had no such order been made. This being so, can we apply

the qualifying language above quoted to the facts of this case? Can we say that the lands in question were subject to taxation when they were not in the town which attempted to impose the tax? Not being in the town, did taxing officers of the town have authority to put the taxing power of the town in motion as to such lands? Could the town officers get jurisdiction over the lands for the purposes of taxation under the statute, without a substantial compliance with the express conditions of the statute? The lands being without the town, were they still liable to taxation within the town? If the town lines of Seneca did not limit the jurisdiction of the officers of that town to the property therein contained, for the purposes of taxation, then to what lands outside of the town did such jurisdiction not extend? Could such town officers exercise an attribute of sovereign power under the statute not conferred upon them by the statute, nor by any action of the county board under the statute? Does a state act through the town, and the town through its officers, in the imposition of taxes upon any land they may choose, however remote from their territorial limits, or only upon such as are placed within their jurisdiction by apt proceedings under the statute?

If the lands in question were not within the jurisdiction of the town of Seneca for the purposes of taxation, then, most certainly, they were exempt from the imposition of any tax by the officers of the town. Exemption by territorial exclusion would seem to bar the imposition of a tax as effectually as an express statutory exemption. When one town is given jurisdiction to impose taxes upon the lands within its territorial limits, it necessarily excludes every other town from exercising the same jurisdiction within such limits, and this in turn excludes every other town from exercising such jurisdiction over lands outside of its territorial limits. Whenever, therefore, to use the language of the late chief justice, above quoted, the "taxing officers assume to levy a tax or to institute a tax proceeding not authorized by statute [that is, without the taxing

district], they are outside of their functions, and are not acting *virtute officii.* They are not in the exercise of the sovereign power of taxation, and are as powerless to tax as private persons. Their whole proceeding is a mere usurpation, and absolutely void throughout for all purposes. In such a case there is nothing for the statute of limitations to act upon."

The facts in the case before us seem to bring it directly within the rule thus tersely stated. The taxing officers of the town of Seneca being without jurisdiction to impose the tax in question upon these lands outside of the territorial limits of the town, we must hold, in the language of Dixon, C. J., above quoted, "that the sale was altogether unauthorized and void, and passed no title or *color of title,* and furnished nothing upon which the statutory bar could operate." That language was evidently borrowed from the opinion of the court in *McKee v. Lamberton,* 2 Watts & Serg., 114, therewith cited. That case was where seated lands were sold for taxes, and the court said: "The sale of such land is altogether unauthorized and void, and passes no title or *color of title;* it being unseated lands which the act of assembly authorizes to be assessed with taxes and sold for their payment. In respect to seated lands there is no jurisdiction given to the assessors to charge the land itself with a tax, the remedy to recover the taxes being against the owner or the occupier personally. Nor is there any jurisdiction or power in the treasurer to sell such land in any case whatever." That case was followed by *Cranmer v. Hall,* 4 Watts & Serg., 36, where it was held that "a sale of land by the treasurer, which was seated at the time the taxes were assessed, is void, and, upon a recovery of possession by the owner, the purchaser is not entitled to compensation for his improvements. A treasurer's or commissioner's title for unseated land does not confer upon the purchaser a possession upon which he may count in claiming title by the act of limitation."

The decision of this case upon the former appeal is in har-

mony with the conclusion we have reached upon this appeal, and aptly illustrates the soundness of the rule. It was there held that "an uninhabited tract of country, nowhere adjoining an existing village, and in which such existing corporation has no special interest, cannot be made by act of the legislature a part of such village for the mere purpose of increasing the corporate revenues by the exaction of taxes," and that the special act by which such annexation was attempted was unconstitutional and void. 50 Wis., 210. There the village officers, under color of the legislative act, assessed these lands and levied a tax thereon for the same year that the taxes in question were assessed and levied; and the then owner of the land, relying upon the validity of such assessment and levy under such legislative enactment, paid what he probably supposed to be a valid tax upon his land; but the court held, in effect, that, the act being unconstitutional, the proceedings under it were nullities. Here, without any color of legislative authority under a mere unpublished order of the county board, the officers of Seneca assumed to assess these lands and levy the tax in question, notwithstanding they were at the time outside the territorial limits of Seneca, the same as they were in law outside of the territorial limits of the village of Shawano, with this difference, that land-owners and the public generally were more likely to believe, and had much more reason for believing, that the lands were in the jurisdiction which had the legislative and executive sanction, than that they were within a jurisdiction conferred by a mere order of the county board, which, for aught that appears, remained a secret with the members of that body. And, notwithstanding we have held, in effect, that the assessment and levy by the village under the legislative and executive sanction gave no power to collect, and hence that payment to that village was ineffectual to satisfy, yet we are now urged to hold that an assessment and levy under a mere unpublished order of the county board, but without any legislative or executive sanction,

was under such color of authority as to support the tax deed based upon such assessment and levy, and to set the statute running in favor of the holder. But to so hold would, in our opinion, break down and forever destroy the dividing line between jurisdiction and want of jurisdiction in taxing officers. It would be a license to town officers to usurp *extra*-territorial jurisdiction whenever they might desire, and then by the argument of *de facto* authority create from mere waste paper muniments of title under the name of tax deeds, which, supported by a statutory bar, would divest the owner of lands situated in another jurisdiction of all title and possession, even when the tax imposed by the rightful jurisdiction was fully paid. No authority has been cited giving sanction to such a doctrine; and even if there were, we should be slow to follow in a pathway necessarily leading to much confusion, and manifestly beset with great peril and injustice to property owners.

But even if we were disposed to take a different view of the question of jurisdiction, we should feel constrained to hold that the case was correctly decided by the circuit court.

The tax deed in question was issued, dated and recorded April 12, 1877, and based upon sales made and certificates issued in 1873, for alleged taxes on the lands for the year 1872. This action was commenced December 8, 1879, and hence it is claimed that the action is barred by the following statute: "Every action or proceeding for the recovery of lands heretofore sold, or which may hereafter be sold, for the non-payment of taxes heretofore levied, shall be commenced within nine months after the recording of the tax deed, and not thereafter: provided that, in case of tax deeds issued prior to the twenty-fifth day of March, 1878, the action, if not then barred, must be brought within nine months from that day, and not thereafter." Section 1210*d*, R. S. Here the tax deed was issued and recorded prior to March 25, 1878, and if the section is applicable, the plaintiff, by the express limitation of the proviso, could only bring this action "within nine months from that

day, and not thereafter," which time expired December 25, 1878, while the action was not commenced until nearly a year thereafter. Counsel concede that previous statutes in the same language have been held to run in favor of the former owner when in possession during the period of limitation. This concession is undoubtedly supported by authority. *Edgerton v. Bird*, 6 Wis., 527; *Falkner v. Dorman*, 7 Wis., 388; *Knox v. Cleveland*, 13 Wis., 245; *Parish v. Eager*, 15 Wis., 532; *Jones v. Collins*, 16 Wis., 594; *Lewis v. Disher*, 32 Wis., 504; *Wilson v. Henry*, 35 Wis., 241; *Stephenson v. Wilson*, 37 Wis., 482; *Smith v. Ford*, 48 Wis., 161.

It is claimed, however, that the construction which would otherwise be put upon section 1210*d*, if considered by itself, must be restricted to the tax-title claimant by reason of the legislative intent as expressed in section 1210*e*, R. S., which limits the time for bringing actions or proceedings for setting aside or cancelling tax sales, tax certificates or tax deeds, or to restrain the issuing of the same, to nine months. The argument is, that such equitable action or proceeding could not be brought by the former owner unless he was in the actual possession of the land, and hence that the nine months' limitation provided in section 1210*d* could not have been intended to give still further protection in his favor. But the law has for some years been settled the other way. In *Pier v. Fond du Lac*, 38 Wis., 470, it was held that one who has the legal title to land, though not in possession, might, independently of the statute, maintain a suit in equity in the nature of a bill *quia timet* to remove a cloud upon his title. See *Goodell v. Blumer*, 41 Wis., 442.

We are clearly of the opinion that section 1210*e*, R. S., was only intended to limit the time for bringing the equitable actions therein mentioned by the land-owner, but in no way to prevent the running of section 1210*d*, R. S., in his favor when in possession, or against him when, being out of possession, he brings an action or proceeding for the recovery of lands in the

cases therein mentioned; nor does it prevent the running of that section in favor of or against the tax-title claimant in the cases therein mentioned. The limiting of the time within which the former owner may commence the actions designated in section 1210e in no way deprives him of the protection against actions by the tax-title claimant given by section 1210d, when such owner is in the actual possession. The contention is, that the statute gives the former owner in actual possession no protection, except to establish his title by an equitable action or proceeding brought within the nine months; but, if he fails to bring such action within that time, the tax-title claimant out of possession may, as here, commence his action, not only after nine months, but after twenty months, notwithstanding the section requires that every action to which it is applicable "must be brought within nine months" from March 25, 1878, "and not thereafter." We are clearly of the opinion that such is not the construction to be put upon section 1210d, but that the tax-title claimants coming within its provisions were required to bring their actions or proceedings within nine months, as therein prescribed. There are three cases, however, excepted from the provisions of section 1210d and section 1210e by section 1210f, and these, from their nature, were each, we think, for the benefit and protection of the former owner, and neither for the benefit of the tax-title claimant nor to prevent the statute running against him. They are: (1) Where the lands were not liable to taxation; (2) where the taxes on such lands have been paid; (3) where the lands have been redeemed according to law. The last clause of section 1189, R. S., contains similar exceptions. These exceptions were each evidently regarded as fundamental, and going to the very inception and groundwork of the tax proceedings; and hence the provisions that in either of the three cases mentioned the statute should not run against the former owner. And the fact that one of these exceptions is where the lands were not liable to taxation, gives force to our views above expressed on the question of juris-

diction; for, as there stated, lands not situated within the town or taxing district are not liable to taxation in such town or district.

Without referring to the evidence or the findings, we hold that the facts stated clearly show that the defendant was in the actual possession of each of the fourteen forties in question, under the Davis contract, from November 15, 1877, to March 18, 1878, and from November 1, 1878, to December 25, 1878, and thereafter. The character of the possession, as thus stated, would seem to be sufficient. The acts of possession were certainly as demonstrative and public as in some of the cases where this court has held them sufficient to stop the running of the statute against the former owner and bar the tax-title claimant. *Haseltine v. Mosher*, 51 Wis., 443; *Wilson v. Henry*, 40 Wis., 594; *Pepper v. O'Dowd*, 39 Wis., 538; *Stephenson v. Wilson*, 37 Wis., 482; *Wilson v. Henry*, 35 Wis., 241. So we think that the adjudications in this state hold, in effect, that it is unnecessary, in order to stop the running of the statute against the former owner and bar the tax-title claimant, that such former owner should be in the actual possession continuously during the whole period prescribed by the statute; but it is sufficient if he is in such possession for any considerable portion of the time. *Lewis v. Disher*, 32 Wis., 504; *Wilson v. Henry*, 35 Wis., 242; *Stephenson v. Wilson*, 37 Wis., 482; *Haseltine v. Mosher*, 51 Wis., 443.

It was stated on the argument that many members of the bar were under an impression that this court has decided that an action for trespass can be maintained for timber removed, against the former owner, by a tax-title claimant who has never been in the actual possession of the land, and the highest market value of such timber, in whatsoever place, shape or condition the same may be found while in possession of the taker, recovered as damages, under section 4269, R. S. This impression has probably arisen from the inadvertent use of the word "title" in *Webster v. Moe*, 35 Wis., 75, and the

repetition of the same in' *Webber v. Quaw*, 46 Wis., 118, and possibly *Hazelton v. Week*, 49 Wis., 661; but see *Wright v. Co.*, 50 Wis., 167. In *Haseltine v. Mosher*, 51 Wis., 443, the question did not arise. None of the members of the court, however, regard the question as having been determined. Counsel for the appellant do not claim that section 4269 applies to a case in which there is an honest controversy about the title, and concede that, if it did, it would be void, for the reason that it would practically debar the defendant from litigating his title by imposing a penalty if his defense failed. But the questions already determined fully dispose of this appeal. We therefore hold it an open question whether a tax-title claimant, who has never acquired the actual possession of the land, can recover against the former owner, as damages, the highest market value, under section 4269, R. S., for timber removed while in the latter's possession.

*By the Court.*— The judgment of the circuit court is affirmed.